## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARK E. IDSTROM, M.D.,     )
              )
    Plaintiff,     )
              )
  vs.         )
              )  Case No. _____
GERMAN MAY, PC, CHARLES W. GERMAN, )
BRANDON J.B. BOULWARE, DANIEL HODES )
and JOHN DOES 1-10,     )
              )
    Defendants.    )

## COMPLAINT

Plaintiff Mark E. Idstrom, M.D., by and through undersigned counsel, for his causes of action against defendants German May, PC, Charles W. German, Brandon J.B. Boulware, Daniel Hodes and John Does 1-10, states and alleges as follows:

## INTRODUCTION

This lawsuit arises out of defendants' collective representation of plaintiff in a lawsuit styled Idstrom v. Alliance Radiology, et al., Case No. 12CV03757, in Johnson County, Kansas District Court.

## PARTIES

1. Plaintiff Mark E. Idstrom, M.D. ("Dr. Idstrom") is a citizen and resident of Florida residing at 400 N. Flager Drive, Apartment 2204, West Palm Beach, FL 33401.

2. Defendant German May, PC ("GM") is a Missouri Professional Corporation with its principal place of business located at 1201 Walnut, Suite 2000, Kansas City, MO 64106.  GM's registered agent for service of process in Missouri is National Registered Agents, Inc., 120 South Central Avenue Clayton, MO 63105.

3.     Defendant Charles W. German ("German") is a citizen and resident of Missouri residing at 366 Scandia Circle, Camdenton, MO 65020-5024.

4.     Defendant Brandon J.B. Boulware ("Boulware") is a citizen and resident of Missouri residing at 3710 Jarboe Street, Kansas City, MO 64111-3849.

5.     Defendant Daniel Hodes ("Hodes") is a citizen and resident of Kansas residing at 10614 Summit Street, Lenexa, KS 66215-2050.

6.     Defendants John Does 1-10 are included because it may be learned through discovery that other individuals and/or entities – including but not limited to German May's predecessor company Rouse, Hendricks, German May and its attorneys and/or employees – were involved in representing Dr. Idstrom and/or are liable for the claims and tortious activities described herein.

7.     Unless otherwise indicated, all defendants – including defendants John Does 1-10 – are hereinafter collectively referred to as "GM".

8.     At all times relevant, individual defendants German, Boulware and Hodes were agents and/or employees of GM.

9.     At all times relevant, GM, through its attorneys, employees and agents, actual, apparent or otherwise, operated, managed, maintained and controlled GM,  a Kansas City, Missouri based law firm that provided legal services in Kansas.

10.     All actions and/or omissions of GM's attorneys, employees and agents, actual, apparent or otherwise, as described herein, were performed within the scope of their duties as attorneys, employees and agents of GM and GM is vicariously liable for the acts and/or omissions of attorneys, employees and agents, actual, apparent or otherwise.

2

11.     At all times relevant, individual defendants German, Boulware and Hodes were attorneys licensed to practice law in Kansas and/or Missouri.

12.     At all times relevant, individual defendants German, Boulware and Hodes were in an attorney-client relationship with Dr. Idstrom.

13.     At all times relevant, individual defendants German, Boulware and Hodes were in a fiduciary relationship with Dr. Idstrom.

## JURISDICTION AND VENUE

14.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a) because this action is between citizens of different states and the amount in controversy is in excess of Seventy-Five Thousand Dollars ($75,000.00).

15.     Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the acts and omissions giving rise to Dr. Idstrom's claims occurred in Kansas and defendants are subject to personal jurisdiction in Kansas.

## FACTUAL ALLEGATIONS IN THE UNDERLYING LITIGATION

### Alliance Radiology

16.     Alliance Radiology ("Alliance") was formed in August of 1998 when four competing radiology groups merged to form a "super group" to illegally allocate market share and leverage the marketplace of managed care contracts which violated the Kansas Restraint of Trade Act ("KRTA") because it prevented competition and artificially increased prices for radiology services.

17.     Alliance has four Divisions and although the individual radiology groups comprising Alliance once competed for hospital contracts, Alliance's Divisions do not. Instead, each Alliance Division has its own "turf" consisting of its principal hospital and

3

surrounding geography.  This allocation scheme is enforced through exclusive Division hospital contracts (to the exclusion of other Divisions) and through an "unwritten rule" of geographic non-competes.  Any new business perceived to be on another Division's "turf" is brought before Alliance's board, where the allocation is enforced.

18.     Each Alliance Division pays its own expenses and keeps its own profits. Incentive compensation paid to any doctor is based solely on the performance of his or her Division.  Thus, the Divisions are "separate profit centers" and do not share risks or profits.

19.     The Divisions service the same hospitals they did prior to forming Alliance but have added other hospitals and facilities based upon their agreed-upon geographic "turfs."  Each Division signs its own hospital contracts and is responsible for ensuring its geographical business remains its business.  The Divisions make their own decisions about marketing, scheduling, hiring, firing and promotion to shareholder.

### Dr. Mark E. Idstrom

20.     Dr. Idstrom joined Alliance's St. Luke's Division in 2005 as an associate to work at Alliance's largest client, St. Luke's Hospital.  When Dr. Idstrom was hired by Alliance, he signed an employment agreement that provided his employment could be terminated at any time with or without cause with the approval of 75 percent of the shareholders in his Division.

21.     In 2007, Dr. Idstrom purchased 100 shares of Alliance stock and became an Alliance shareholder.  He then became President of the St. Luke's Division (later known as the Midwest Division) and a member of Alliance's Board of Directors.

4

**Loss of St. Luke's Hospital Business**

22.    In 2007, Alliance's contract with St. Luke's Hospital was set to expire. St. Luke's proposed a deal that would have allowed Dr. Idstrom and other radiologists in his Division to continue working at St. Luke's.  However, the other three Divisions of Alliance blocked the proposal and prohibited Dr. Idstrom's Division from entering into a deal with St. Luke's Hospital because Alliance would not be the exclusive radiology provider for St. Luke's.  The St. Luke's Division's loss of this contract represented nearly 40% of the Division's annual revenue.  This caused Dr. Idstrom's income to decrease by $150,000 in 2008 alone, or by roughly one-third.  The income of the other Divisions did not similarly decrease but the other Divisions refused to allow the underemployed radiologists in the St. Luke's Division to work at the other three Divisions' hospitals.

23.    After losing the St. Luke's contract, the St. Luke's Division was renamed the Midwest Division.  In an attempt to make up the lost St. Luke's Hospital business, Dr. Idstrom and other members of the Midwest Division solicited work inside and outside its illegally allocated geographic areas.

**Loss of US Oncology Business**

24.    In 2007, the US Oncology Network wanted to use Alliance for reading outpatient diagnostic images from several hospitals.  Dr. Idstrom and the Midwest Division had an established relationship with physicians and patients at several of these hospitals.  However, because of Alliance's market allocation process, the Shawnee Mission Division of Alliance claimed US Oncology fell within its allocated market and obtained exclusive rights to all outpatient diagnostic business from US Oncology.

Alliance's anticompetitive conduct and illegal market allocation scheme therefore caused Dr. Idstrom to suffer a significant financial loss.

### Loss of Interventional Radiology Business

25.     Also in 2007, a US Oncology physician approached the Midwest Division about another facet of its business – interventional radiology services.   The US Oncology physician expressed a strong desire that the Midwest Division, and specifically Dr. Idstrom, provide the services.  However, at Alliance Board meetings, the Shawnee Mission Division objected, once again arguing that US Oncology was its exclusive client due to Alliance's illegal market allocation scheme.  Over Dr. Idstrom's and others' objections, the Alliance Board authorized the Shawnee Mission Division to receive the exclusive contract for interventional radiology, even though the Shawnee Mission Division (unlike the Midwest Division) did not have the requisite number of interventional radiologists.   Alliance's anticompetitive illegal market allocation scheme again caused Dr. Idstrom to suffer a significant financial.

### Loss of Centerpoint Medical Center Business

26.     In 2010, Centerpoint Medical Center presented a significant financial opportunity for Dr. Idstrom and other radiologists in the Midwest Division.  Centerpoint had a contract with another radiology firm, Western Missouri Radiological Group ("WMRG").   The CEO of Centerpoint approached Dr. Idstrom about the Midwest Division providing interventional radiology services.   The CEO was familiar with Dr. Idstrom and the Midwest Division from their prior work at other affiliated hospitals. Centerpoint also specifically asked that if Alliance got the contract, that the Shawnee Mission and Carondelet Divisions of Alliance not be involved because of prior negative

interactions. Following this initial approach, the Midwest Division briefly worked at Centerpoint based upon the terms of the WMRG contract because the Midwest Division was the only Alliance Division with the physician capacity to service the hospital.

27.     Centerpoint then proposed that the Midwest Division merge with WMRG and assume the Centerpoint contract for all radiology services (diagnostic and interventional). WMRG was in favor of the merger. This would have been a huge and lucrative contract for the Midwest Division and Dr. Idstrom. Dr. Idstrom made the proposal to the Alliance Board but representatives from the Carondelet and the Shawnee Mission Divisions blocked the contract arguing that Centerpoint fell outside the Midwest Division's illegally allocated "turf." Alliance's anticompetitive illegal market allocation scheme again caused Dr. Idstrom to suffer a significant financial loss.

**The Midwest Division is Removed from Alliance**

28.     In July 2010, Alliance's Board — except representatives from the Midwest Division — met at Hallbrook Country Club to discuss Dr. Idstrom's challenge to Alliance's anticompetitive illegal market allocation scheme and Alliance's failure to support his Division after the loss of the St. Luke's Business. In response to Dr. Idstrom's concerns, Alliance's Directors discussed removing the Midwest Division from Alliance if it did not agree to remove Dr. Idstrom from the Alliance Board and as president of the Division. Dr. Anthony Harmon presented the idea and the shareholders from the other three divisions voted to remove the Midwest Division from Alliance.

29.     Shortly after the meeting at Hallbrook Country Club, Dr. Douglas Best held another meeting at his house (from which Dr. Idstrom was expressly excluded) with other Alliance directors and they laid out the conditions under which the Midwest

7

Division could remain in Alliance – specifically that (a) Dr. Idstrom be removed as President of the Midwest Division; (b) Dr. Idstrom be removed from the Alliance Board; and (c) Dr. Idstrom be prevented from any further negotiations with potential customers, including Centerpoint Medical Center.   The Midwest Division agreed to these conditions.   Thereafter, Alliance's shareholders voted to reinstate the Midwest Division. Dr. Idstrom remained an employee and shareholder of the Midwest Division and Alliance.

30.     After his removal as President of the Midwest Division, and in response to his concerns and complaints about the negative effects of Alliance's illegal market allocation scheme, Dr. Idstrom was excluded from multiple Alliance and Midwest Division meetings, communications among Alliance physicians, and important decisions affecting Alliance.

31.     When Centerpoint Medical Center learned that Dr. Idstrom had been removed as president of the Midwest Division, it gave the entire contract to another radiology group. Alliance's refusal to deviate from its anticompetitive illegal market allocation scheme caused Dr. Idstrom and the Midwest Division to lose a lucrative and exclusive contract with Centerpoint Medical Center.

**Wrongful Termination of Dr. Idstrom**

32.     In late 2011, Dr. Best, a Midwest Division shareholder and Alliance board member, began communicating with Virtual Radiology Group ("vRAD") about a potential merger.  If the merger occurred, Midwest Division shareholders – including Dr. Idstrom – would receive a combined $4 million payout. However, vRAD refused to complete the merger if Dr. Idstrom remained a stockholder and employee of the Midwest Division. As

a result, on February 3, 2012, the Midwest Division's shareholders—other than Dr. Idstrom—unanimously voted to terminate him.   By terminating Dr. Idstrom, the directors/shareholders of the Midwest Division and Alliance breached their fiduciary duties to Dr. Idstrom as a shareholder of Alliance and the Midwest Division.

33.     Dr. Idstrom was terminated (a) because his fellow Midwest Division shareholders did not want him to receive his share of the $4 million payout of the proposed vRAD merger and (b) because he was an outspoken critic of Alliance's illegal market allocation scheme and anticompetitive conduct.

**Dr. Idstrom is Unable to Find Employment**

34.     Dr. Idstrom's wrongful termination effectively excluded him from practicing radiology in the Kansas City metropolitan area because (a) like all other Alliance shareholders, he was forced to sign a resignation of medical staff membership the day he was hired and (b) Alliance demands exclusive contracts with hospitals that bar non-Alliance radiologists from working at the hospitals.

35.     Since being terminated by Alliance, Dr. Idstrom has been unable to find work in the Kansas City Metropolitan area, let alone a position commensurate with his training and experience.

**Dr. Idstrom Retains GM**

36.     In May of 2012, Dr. Idstrom hired GM (then known as Rouse Hendrick German May) to file a lawsuit against Alliance and several Alliance Directors (hereinafter the "Director Defendants") for violating the Kansas Restraint of Trade Act ("KRTA"), breach of fiduciary duty and wrongful termination.   GM and its attorneys were solely responsible for representing Dr. Idstrom and pursuing his claims.

37.    Dr. Idstrom initially compensated GM on an hourly basis. After he paid GM approximately $750,000 in legal fees and personally incurred approximately $300,000 in expenses, the parties converted their arrangement to a 70/30 percent contingent fee agreement.

38.    After converting to a contingent fee agreement with Dr. Idstrom and GM was no longer being paid by the hour, GM's level of attention to his Lawsuit in general and its level of attention to detail in particular decreased dramatically.   Instead of focusing on Dr. Idstrom's Lawsuit as GM was legally and ethically required to do, GM diverted its attention to *inter alia* clients who were paying GM by the hour and by doing so all defendants willfully, wantonly and recklessly disregarded Dr. Idstrom's interests because they put their interests ahead of his interests which resulted in GM scrambling at the last minute to prepare for trial which in turn directly resulted in GM being unprepared for trial which caused or contributed to cause Dr. Idstrom from being unable to prevail on his claims at trial and being awarded $25 million in collectable damages.

**Pretrial Litigation**

39.    On May 8, 2012**,** GM filed a lawsuit on behalf of Dr. Idstrom against Alliance and the Director Defendants styled <u>Idstrom v. Alliance Radiology, et al</u>., Case No. 12CV03757, in Johnson County, Kansas District Court for violations of the KRTA, tortious interference with contract, business relations and business expectancy, breach of fiduciary duty and breach of contract (hereinafter the "Lawsuit").

40.    Former GM partner Boulware was in charge of the Lawsuit and drafted and filed Dr. Idstrom's initial petition.

10

41.     When Boulware drafted and filed Dr. Idstrom's initial petition he was not licensed to practice law in Kansas and had not been admitted *pro hac vice* to practice in Kansas.

42.     During the three years of pretrial litigation, GM filed three petitions on behalf Dr. Idstrom.  In the prayer for relief following the breach of fiduciary duty count in each petition, GM claimed "punitive damages for the willful and reckless breach of fiduciary duty" on the part of the Director Defendants.  (Second Amended Petition attached hereto as Exhibit A and incorporated herein by reference).

43.     The Lawsuit was originally set for trial on July 14, 2014.  A final pretrial conference was held on April 10, 2014.  Dr. Idstrom's portion of the final Pretrial Order was prepared and approved by GM.  In the section on "Amendments to Pleadings," the Pretrial Order said "None."

44.     On July 11, 2014, GM asked the court to continue the trial.  The request was granted and the trial was rescheduled for May 5, 2015.

45.     Prior to trial, the trial court *sua sponte* granted the Director Defendants' unfiled motion for summary judgment on Dr. Idstrom's claim for breach of fiduciary duty resulting in his wrongful determination.  As a result of that decision, Dr. Idstrom was prevented from presenting evidence that (a) he was fired so the Director Defendants could make more money on the vRAD merger; and (b) that certain Director Defendants worked to get other shareholders "on board" with his termination.

46.     Also prior to trial, the trial court granted the Director Defendants' motion for summary judgment on KRTA claims that arose before May 8, 2009 despite factual and legal issues as to whether the statute of limitations should be tolled or extended.

11

47.     On April 7, 2015, the Director Defendants filed a motion *in limine* to exclude all evidence and argument about punitive damages because GM had not sought leave to amend Dr. Idstrom's petition to include a punitive damage claim.

48.     In response, on April 17, 2015, after three years of litigation and 18 days before trial, GM filed a motion to amend Dr. Idstrom's petition to include a punitive damage claim.

49.     The trial court denied GM's motion to add a punitive damage claim to Dr. Idstrom's petition as untimely.

**The Trial**

50.     Dr. Idstrom's Lawsuit was tried to a jury on four claims:

a.     All defendants violated the KRTA by forming and operating Alliance;

b.     Certain Directors Defendants breached fiduciary duties owed to Dr. Idstrom in their capacities as Alliance Directors (i) by allocating work under Alliance's Division's hospital contracts in a manner that benefited them personally, (ii) by precluding certain Alliance radiologists from performing services at certain hospitals, and (iii) by causing certain business to be directed away from Alliance;

c.     Director Defendants Drs. Best, Richardson and Varriano breached their fiduciary duties to Dr. Idstrom by putting their interests above Dr. Idstrom's interests as an Alliance shareholder in order to earn more money from the proposed VRad merger; and

d.      All defendants engaged in a civil conspiracy to commit the underlying torts.

51.      The jury found Alliance did not violate the KRTA but awarded Dr. Idstrom $718,500 in damages because certain Director Defendants breached fiduciary duties to him and were engaged a civil conspiracy to harm him financially.

**Post-Trial Motions**

52.      GM filed several post-trial motions on behalf of Dr. Idstrom.  The trial court ruled on these motions as follows:

a.      The trial court denied Dr. Idstrom's motion for new trial on the issue of Jury Instruction No. 25 being contrary to Kansas law because GM failed to object to the instruction.

b.      The trial court denied Dr. Idstrom's motion for new trial based on defense counsel's prejudicial and inflammatory closing argument emphasizing erroneous Jury Instruction No. 25 and other issues.  The trial court agreed part of defense counsel's closing argument was improper but denied GM's motion for new trial because it failed to object to the statements.

c.      The $718,500 breach of fiduciary duty/civil conspiracy verdict was upheld.

d.      The trial court vacated the breach of fiduciary duty verdict against Director Defendant Dr. Anthony as being barred by the statute of limitations.

e.      The trial court vacated the breach of fiduciary duty verdicts against Director Defendants Drs. Best, Richardson and Varriano because the damages

awarded were deemed to be "posttermination" damages which the trial court had previously dismissed on summary judgment.

      f.      Because the civil conspiracy award was against "all defendants," the trial court vacated the award as to defendants Alliance and Director Defendant Dr. Anthony but upheld the award as to the remaining Director Defendants.

      g.      The trial court denied Dr. Idstrom's post-trial contention that it had improperly denied his motion to amend his petition to add a punitive damage claim. The court affirmed its prior ruling that GM's motion to amend was untimely.

### The Appeal

53.      Following post-trial motions, both parties in the Lawsuit appealed to the Kansas Court of Appeals.

54.      Because GM had alleged punitive damages in Dr. Idstrom's petition and in the Pretrial Order, on appeal it contended the district court "injected a procedural requirement that did not exist" in order to deny Dr. Idstrom's motion to add a punitive damage claim. The Court of Appeals rejected this contention because the district court relied on the April 10, 2014, pretrial order — which the parties agreed was to be the final pretrial order and would have been had the trial date not been continued — to deny Dr. Idstrom's motion because the pretrial order said there were no amendments to the pleadings. The Court of Appeals affirmed the trial court's decision stating:

> Throughout the proceedings, the district court consistently held the parties were bound by the April 10, 2014, final pretrial order. A reasonable person could take the view adopted by the district court. The district court did not

abuse its discretion when it denied Idstrom's motion to amend his pleadings to include a claim for punitive damages. (Court of Appeals Decision No. 115,099 attached hereto as Exhibit B and incorporated herein by reference).

**Negligent Failure to Add a Punitive Damages Claim to Dr. Idstrom's Petition**

55.    Although the evidence GM gathered to support Dr. Idstrom's punitive damage claim was excluded at trial because it negligently failed to amend Dr. Idstrom's petition to add a punitive damage claim, GM nevertheless introduced overwhelming evidence proving that the Director Defendants willfully breached their fiduciary duty to Dr. Idstrom by acts of self-dealing including:

a.    directing the market allocation scheme that resulted in a loss of revenues and profits to the Midwest Division and Dr. Idstrom specifically;

b.    causing business to be directed away from Alliance altogether; and

c.    forcing Dr. Idstrom out of his position as Midwest Division President and then out of Alliance entirely.

56.    The Court of Appeals affirmed the jury's $718,500 verdict finding the Director Defendants intentionally breached their fiduciary duties to intentionally harm Dr. Idstrom for their own personal financial benefit and were engaged in a civil conspiracy to do so.

57.    In Kansas, civil conspiracy is an intentional tort requiring a specific intent to accomplish the contemplated wrong.

58.    In Kansas, punitive damages are awarded to punish wrongdoers for malicious, vindictive or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongdoings.

59.     The same evidence that supported the jury's verdict for breach of fiduciary duty/civil conspiracy was clear and convincing evidence and was more than sufficient for the jury to have found that an award of punitive damages was appropriate "for the willful and reckless breach of fiduciary duty" on the part of the Director Defendants as alleged by GM in all three of Dr. Idstrom's petitions.

60.     If GM had complied with Kansas law on pleading punitive damages and timely filed a motion to add a punitive damage claim to Dr. Idstrom's petition, the trial court would have granted GM's motion and the jury would have recommend an award of punitive damages against the defendants in the Lawsuit.

61.     GM's negligent failure to know, understand and follow Kansas law on pleading punitive damages and its negligent failure to timely seek leave to amend Dr. Idstrom's petition to add a punitive damage prevented Dr. Idstrom from recovering punitive damages in the Lawsuit.

62.     Kansas law allows Dr. Idstrom to recover from GM the punitive damages he was unable to recover in the Lawsuit because of GM's negligence and legal malpractice.  Hunt v. Dresie, 241 Kan. 647, 740 P.2d 1046 (1987).

63.     But for GM's negligence in failing to timely amend Dr. Idstrom's petition to add a claim for punitive damages, the jury in the Lawsuit would have recommended an award of punitive damages and the trial court would have awarded Dr. Idstrom $5 million in punitive damages against the defendants in the Lawsuit which would have been a collectable judgment.

**Negligent Failure to Preserve for Appeal**
**Dr. Idstrom's Breach of Fiduciary Duty/Wrongful Termination Claim**

64.     At the hearing on the Director Defendants' motion for summary judgment in the Lawsuit, the trial court *sua sponte* granted the Director Defendants' unfiled motion for summary judgment on Dr. Idstrom's claim for breach of fiduciary duty resulting in his wrongful termination.  The trial court held:

> I'm going to grant the fiduciary duty motion with respect to post-termination, and here's the reason.  There can't be any breach of fiduciary duty in terminating Dr. Idstrom when his contracts of employment specifically provided that employment could be terminated for any reason.

65.     Thereafter, in a Motion to Admit evidence prior to trial, GM raised the issue of the vRAD evidence, including its effect on Dr. Idstrom's termination.  The trial court confirmed its earlier ruling on summary judgment dismissing Dr. Idstrom's breach of fiduciary duty/wrongful termination claim but held that some vRAD evidence was relevant to Dr. Idstrom's KRTA and civil conspiracy claims.

66.     However, the trial court's dismissal of Dr. Idstrom's breach of fiduciary duty/wrongful termination claim prevented GM from presenting evidence that (a) Dr. Idstrom was fired so certain Director Defendants could make more money on the vRAD merger; and (b) that certain Director Defendants worked to get other shareholders "on board" with his termination.  This error led to nominal $1 damage awards against the members of Dr. Idstrom's Midwest Division – because the jury was prevented from awarding him post-termination damages for being unable to find employment.

67.     As GM correctly argued on appeal, the trial court's *sua sponte* granting of the Director Defendants' unfiled motion for summary judgment on Dr. Idstrom's breach of fiduciary duty/wrongful termination claim was clear error and an abuse of discretion

because (a) the Director Defendants did not file a motion for summary judgment on the claim and the trial court decided the issue without the benefit of briefing or explanation; and (b) the trial court failed to grasp that Dr. Idstrom was terminated because of his opposition to Alliance's anticompetitive market allocation scheme (an illegal act) and certain Director Defendants' breach of fiduciary duty (an illegal act) to cheat him out of his share of a $4 million proposed merger with vRAD in furtherance of a civil conspiracy (an illegal act).

68.     Nothing in the language of Dr. Idstrom's Employment Agreement allowed the type of conduct the Director Defendants engaged in because all such acts were against Kansas public policy.   Kansas law prohibits the termination of an at-will employee when doing so breaches fiduciary duties owed to the employee and the termination is in furtherance of a civil conspiracy to harm the employee.

69.     The evidence GM gathered on Dr. Idstrom's breach of fiduciary duty/wrongful termination claim demonstrated that beginning in October of 2011, there were a series of face-to-face and telephonic meetings between certain Midwest Division members and vRAD representatives.   Without the knowledge of the Alliance Board, Director Defendant Dr. Best sent confidential financial and other proprietary information to vRAD as part of these meetings.

70.     On December 11, 2011, Director Defendant Dr. Best had a call with vRAD Vice President Jordan Halter.   In Mr. Halter's notes of that call, he wrote "Idstrom need[s] to go away."

71.     At the same time, Mr. Halter developed a "strawman" proposal at the request of Director Defendant Dr. Best to explain what the merged company would look

like. The "strawman" proposal excluded Dr. Idstrom from the proposed merged company. And in a cover email to some colleagues attaching a "strawman" proposal, Mr. Halter wrote "we will need upfront money to get rid of Partner named Mark Idstrom."

72. In further emails to Director Defendant Dr. Best in early January of 2012, Mr. Halter wrote that "OK…the #1 thorny issue I see is Idstrom…[i]t will come down to some 'right sizing'…" Mr. Halter explicitly noted that "the less partners moving forward = more 'earn out' for remaining partners" (e.g. Director Defendants Drs. Best, Richardson, Yetter, Chandramohan, Varriano and Marcus).

73. On January 24, 2012 – ten days before Dr. Idstrom was terminated – Director Defendant Dr. Best informed Mr. Halter of the decision to terminate Dr. Idstrom, and he asked Mr. Halter to hold such information "in the strictest confidence."

74. The Midwest Division and vRAD later signed a mutual confidentiality agreement and a non-binding term sheet. The merger had not yet occurred.

75. Certain Midwest Division members, some of whom were members of the Alliance Board of Directors, conspired to keep information about the proposed vRAD merger from Dr. Idstrom, including their plan to terminate him before the merger occurred in order to increase their individual "earnout." This was a breach of fiduciary duties owed to Dr. Idstrom.

76. Following his removal as President of the Midwest Division, and in response to his concerns and complaints about the negative effects of Alliance's illegal market allocation scheme, Dr. Idstrom was excluded from multiple Alliance and Midwest Division meetings, communications among Alliance physicians, and important decisions affecting Alliance.

19

77.     The Director Defendants' coordinated exclusion of Dr. Idstrom continued until a February 3, 2012 meeting.  At that meeting, Director Defendants Drs. Best and Richardson informed Dr. Idstrom he was terminated without cause.  They assured him that his termination had nothing to do with his abilities as a radiologist or his work ethic.

78.     The day after Dr. Idstrom was terminated, Director Defendant Dr. Best informed Mr. Halter at vRAD that "Idstrom is done."  Mr. Halter responded "Congrats…"

79.     GM's appellate brief correctly emphasized that the trial court erred by holding that the events surrounding Dr. Idstrom's termination (including the termination itself) were irrelevant to whether the Director Defendants breached their fiduciary duties to Dr. Idstrom.

80.     GM correctly contended on appeal that it could not be seriously disputed that Director Defendants Drs. Best, Richardson and Varriano did not act in Dr. Idstrom's best interests, seeking to "enrich themselves" at his expense in their secret dealings with vRAD, which ultimately culminated in Dr. Idstrom's termination.  GM further correctly contended that because these fiduciary duties were self-dealing, it was incumbent upon the Director Defendants under Kansas law to prove the entire fairness of their decisions by clear and convincing satisfactory evidence at trial.  The Director Defendants never argued entire fairness at trial because they did not have to – the district court erroneously granted summary judgment on its own.

81.     GM's appellate brief, with on point citations to controlling Kansas law, established the trial court committed reversable error by *sua sponte* dismissing Dr. Idstrom's breach of fiduciary duty/wrongful termination claim.

20

82.     However, because GM negligently failed to include the Director Defendants' motion for summary judgment and memorandum in support in the record on appeal despite being specifically asked to include "everything" in the record on appeal, the Court of Appeals refused to address this issue.

83.     But for GM's negligent failure to preserve for appeal Dr. Idstrom's breach of fiduciary duty/wrongful termination claim, the Court of Appeals would have reversed the trial court's *sua sponte* decision granting summary judgment on the claim and remanded the case to the district court and the jury, according to GM's expert witness, would have awarded Dr. Idstrom $4,510,578.00 in damages ($751,763 annual income x 6 years) which would have been a collectible judgment.

### Negligent Failure to Preserve for Appeal
### Dr. Idstrom's Statute of Limitation Argument

84.     Well before Dr. Idstrom was terminated, he spoke with Alliance's lawyer about his concerns with Alliance's illegal anticompetitive conduct.  Alliance's lawyer told Dr. Idstrom there was nothing he could do about it because he was prohibited from suing Alliance.  This directive prevented Dr. Idstrom from pursuing his KRTA claims sooner.

85.     Nevertheless, the trial court granted the Director Defendants' motion for summary judgment on any KRTA claim arising before May 8, 2009 despite factual issues as to whether the statute of limitations should be tolled or extended. Compounding this error, the trial court instructed the jury that "actions and damages for actions" before May 8, 2009 had been dismissed as a matter of law.

86.     GM correctly argued on appeal that the trial court's ruling was reversible error because the Director Defendants' conduct tolled the KRTA statute of limitation and because they presented no evidence supporting the affirmative defense as required by Kansas law.

87.     However, because GM negligently failed to include the Director Defendants' motion for summary judgment and memorandum in support in the record on appeal, the Court of Appeals refused to consider this issue.

88.     But for GM's negligent failure to preserve for appeal Dr. Idstrom's argument that the trial court erred in barring claims, damages and evidence prior to May 8, 2009, the Court of Appeals would have reversed the trial court's decision and remanded the case to the district court for a trial which would have resulted in the jury awarding Dr. Idstrom KRTA damages for losses sustained prior to May 8, 2009 which would have been a collectible judgment.

**Negligent Failure to Object to Jury Instruction No. 25 and Negligent Failure to Propose Proper KRTA/Antitrust Jury Instructions**

89.     The KRTA defines a "trust" as a combination of capital, skill, or acts, by two or more persons and prohibits a "trust" from preventing competition and creating or carrying out restrictions in trade or commerce.  K.S.A. § 50-101.

90.     For a "trust" to be illegal, the KRTA requires the "trust" to be comprised of two or more persons.  The definition of "person" or "persons" under the KRTA is not limited.  It includes "individuals . . . voluntary associations and other associations."

91.     In Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984), the U.S. Supreme Court held that a corporation (Alliance) cannot form a combination or

conspiracy in violation of Section 1 of the Sherman Act with its wholly owned subsidiaries (Alliance's Divisions).  Thus, the <u>Copperweld</u> doctrine generally bars claims of an unlawful antitrust combination or conspiracy against the members of a single corporate family.

92.    To avail itself of the "single entity" defense, the entity in question must possess both (1) unitary decision-making and (2) a single aggregation of economic power.  <u>American Needle, Inc. v. National Football League</u>, 560 U.S. 183, 130 S. Ct. 2201, 2212 (2010).  A plaintiff need not prove the alleged conspirators are completely independent.  Rather, the plaintiff must simply show a lack of "complete unity of interest." <u>Id</u>.

93.    To escape KRTA liability in the Lawsuit, Alliance argued that regardless of the fact that it had four separate Divisions comprised of many individuals, it was a "single entity" and therefore was incapable of conspiring with itself.  GM knew or should have known this defense was inapplicable if a group of conspirators (Alliance's Divisions and its individual shareholders/members) simply labels itself as a single entity (Alliance).  GM also knew or should have known that what matters is the substance of the arrangement, not its formalities.

94.    During the jury instruction conference, the Director Defendants proposed Jury Instruction No. 25 which required Dr. Idstrom to show that "The actions of the individual defendants were separate from the actions of defendant Alliance Radiology."

Jury Instruction No. 25 stated:

> Plaintiff Dr. Idstrom may recover damages from the individual defendants for violation of the Kansas Restraint of Trade Act only if you find that Plaintiff Dr. Mark Idstrom has proven:

       (1)     That Alliance is a Trust (as instructed in Instruction No. 21);

       (2)     That one or more of the individual Defendants formed or are interested, either directly or indirectly, in Alliance; and

       (3)     The actions of the individual defendants were separate from the action of defendant Alliance Radiology.

       You may find that an individual was or is interested in Alliance because he or she served as a principal, agent, representative, consignee or otherwise.

95.     GM should have immediately recognized the language of Jury Instruction No. 25 was a misstatement of Kansas law because the KRTA did not require actions of the individual Director Defendants to be "separate from the actions" of Alliance.  GM, however, negligently failed to object to the instruction.

96.     GM's negligent failure to object to Jury Instruction No. 25 directly caused Dr. Idstrom to sustain money damages because the instruction required the jury to find that Alliance was a "trust" **before** determining that the individual defendants violated the KRTA.  The jury should have been able to decide that certain Director Defendants conspired to divide the radiology market separate and apart from Alliance which was a violation of the KRTA.

97.     As instructed, the jury could not find Alliance liable because the individual defendants' actions could not be considered in deciding whether Alliance was an illegal "trust" comprised of two or more persons – a point emphasized repeatedly by defense counsel in closing argument.

98.     On appeal, GM correctly argued the instruction was error because it prevented the jury from finding liability **because** the individual defendants were

furthering the anticompetitive goals of Alliance and thus were not acting separately from Alliance.

99.    GM's negligent failure to object to Jury Instruction No. 25 deprived Dr. Idstrom of a more favorable standard of review and limited the trial court's and the Court of Appeals' review of the instruction to clear error and both resolved the issue against Dr. Idstrom.

100.    GM should have objected to Jury Instruction No. 25 because the individual Director Defendants artificially allocated the geographic "turfs" to drive up reimbursement rates for managed care contracts which was a violation of the KRTA and satisfied the KRTA's two or more persons requirement.

101.    GM should also have objected to Jury Instruction No. 25 because regardless of its corporate formalities, Alliance was a joint venture consisting of four separate divisions prohibited from competing to illegally allocate the market for Kansas City radiology services resulting in artificially inflated reimbursement rates in violation of the KRTA.

102.    Under Kansas law, a joint venture occurs where two or more persons combine to engage in a single business enterprise for profit, such that liability is imputed to all participants.

103.    The U.S. Supreme Court's Copperweld decision prohibiting liability for a "single entity" was clarified by the Supreme Court's decision in American Needle, Inc. v. Nat'l Football League, 130 S.Ct. 2201 (2010), which considered whether a joint venture of the teams in the NFL and the NFL itself was immune from Sherman Act liability as a single entity.

104.   The NFL and the NFL teams pooled their resources and formed a separate corporation ("NFLP") to issue licenses for the teams' trademarks and brought that property to market in a joint venture.  NFLP licensed the intellectual property to a single vendor and an excluded vendor sued.

105.   The only question before the Court was whether NFLP acted as a "single entity" in granting the exclusive license to Reebok or was "joint action" of the 32 teams that created it.   Section 1 of the Sherman Act, like the KRTA, bans contracts, combinations and conspiracies in restraint of trade but "applies only to concerted action that restrains trade." Single firm conduct cannot be reached by Section 1.

106.   The Supreme Court held that the NFLP joint venture was subject to challenge as concerted activity under Section 1 of the Sherman Act.  The Court found that the teams "do not possess either the unitary decision-making quality or the single aggregation of economic power characteristic of independent action." The agreement therefore joined together "separate economic actors pursuing separate economic interests . . . such that it deprives the marketplace of independent centers of decision-making."

107.   Alliance was formed by four separate radiology groups who are separate economic actors pursuing separate economic interests.  The American Needle case directly addressed Alliance's illegal anticompetitive conduct and demonstrated why Jury Instruction No. 25 was a misstatement of Kansas antitrust law.

108.   If GM had proposed proper KRTA/antitrust jury instructions, Dr. Idstrom would have been awarded nearly $21 million on his KRTA claims which would have been a collectable judgment against the defendants in the Lawsuit.

109.    Because GM negligently failed to object to Jury Instruction No. 25 and negligently failed to propose proper KRTA jury instructions, the jury could not find Alliance violated the KRTA.

110.    But for GM's negligent failure to object to Jury Instruction No. 25 and its negligent failure to propose proper KRTA/antitrust jury instructions, the Court of Appeals would have reversed the trial court's decision approving Jury Instruction No. 25 and remanded the case to the district court for a new trial on Dr. Idstrom's KRTA claims which would have resulted in a collectible judgment of KRTA damages against the defendants in the Lawsuit.

111.    According to GM's expert witness, Dr. Idstrom was entitled to nearly $21 million in KRTA damages ($5,049,755.00 in actual damages, $15,149,265.00 for trebling, and $750,685.50 for attorney fees and costs).

**Negligent Failure to Appeal Defense Counsel's Prejudicial Closing Argument**

112.    During closing argument, the Director Defendants' attorney made several significant and prejudicial misstatements of law that emphasized the trial court's erroneous Jury Instruction No. 25.   Defense counsel argued that Alliance was a registered professional association and therefore could not as a matter of law violate the KRTA because it was a single entity.   Defense counsel stated:

> You'll see in Instruction No. 21 that the Judge has instructed you that a trust is two or more persons.  What are the two?  Alliance by itself is one… They're claiming Alliance is a trust because Alliance has four divisions….A Division is not a person by definition.

113.    Defense counsel then compared Alliance to General Motors and argued that corporations cannot be held liable under the KRTA – a false statement.   Although

this and similar statements were specifically prohibited by GM's motion *in limine,* GM negligently failed to object to the statements.

114.   Also during closing argument, defense counsel argued that the events surrounding the loss of the St. Luke's and US Oncology business were "out of the case" because of the statute of limitations.  Defense counsel stated:

> First of all, let's talk about St. Luke's. This is not an issue which the Judge has instructed you can find a claim on. He didn't tell you, well, Dr. Idstrom sustained 'X' amount of damages from the loss of the St. Luke's deal, which is no[w] out of the case.  He didn't tell you Dr. Idstrom suffered 'X' amount of damages from the loss of the US Oncology deal which is no[w] out of the case.

115.   GM negligently failed to object to these false statements which were highly prejudicial because the loss of the St. Luke's and US Oncology business was not out of the case for purposes of KRTA liability.  By negligently failing to object to these false and/or improper statements and allowing defense counsel to wrongfully argue that these events were out of the case, the jury was led to believe that much of the defendants' anticompetitive behavior could not be considered when deciding if Alliance was a trust.

116.   Post-trial the trial court found defense counsel's statements about St. Luke's and US Oncology were improper but refused to grant a new trial because GM negligently failed to object to the statements.

117.   To compound matters, GM negligently failed to appeal the trial court's denial of Dr. Idstrom's motion for new trial based on defense counsel's false and/or improper closing argument statements.

118.    If GM had appealed the trial court's ruling denying Dr. Idstrom's motion for new trial because of defense counsel's prejudicial and improper closing argument, the Court of Appeals would have remanded the Lawsuit for a new trial and Dr. Idstrom would have prevailed at trial on his KRTA claim and received KRTA damages which would have been a collectible judgment.

**GM's Conflict of Interest**

119.    After the Court of Appeals issued its decision, GM had a conflict of interest handling Dr. Idstrom's Kansas Supreme Court appeal because the Court of Appeals documented three instances of *per se* legal malpractice on the part of GM.

120.    On January 19, 2017, after Dr. Idstrom met with GM's principals to discuss the firm's conflict of interest in handling his supreme court appeal, GM Principal Kirk T. May wrote a letter to Dr. Idstrom summarizing that meeting.  This letter states in pertinent part:

> [W]e discussed the Court of Appeals observations concerning the handling of the appeal and the trial, suggesting German May made mistakes negatively impacting three of your cross-appeal points.
>
> First, the Court of Appeals affirmed the trial court's granting summary judgment on antitrust claims that arose before May 8, 2009.  The Court of Appeals concluded that because the Directors' motion and supporting memorandum for summary judgment were not part of the record on appeal, the record was not sufficient to permit the Court to determine whether the trial court erred in granting summary judgment.
>
> Second, the Court of Appeals affirmed the trial court's denial of post-termination damages.  Again, the Court observed that the record on appeal was not sufficient to address that issue because the Directors' summary judgment motion and supporting memorandum were not in the record on appeal.
>
> Third, the Court of Appeals affirmed the denial of the motion to amend to assert punitive damages because the April 10, 2014 Pretrial Order

29

indicated there were no further amendments to the pleadings. The opinion can be read to suggest that either the Pretrial Order should have been amended or proposed differently or that a motion to amend should have been filed at a time so as there would be no question of whether it was precluded by the Pretrial Order.

The Opinion can be read to state that not including the Directors' summary judgment motion and supporting memorandum in the record on appeal was a mistake by German May, and that German May mistakenly failed to preserve your ability to assert a punitive damages claim by stating in the April 10, 2014 Pretrial Order Under Section 6, Amendment to Pleadings, "None."

These mistakes, taken as true, could arguably give rise to a claim for malpractice and damages against German May for damages on the claims precluded by the Opinion.

121.   GM handled Dr. Idstrom's Kansas Supreme Court appeal but the Court declined to review to the Court of Appeals' decision.

122.   Thereafter, GM received a $215,500 contingent fee from the jury's $718,500 verdict, which was in addition to the approximately $750,000 Dr. Idstrom had already paid GM.

## COUNT I – LEGAL MALPRACTICE

Plaintiff, for Count I of his causes of action against defendants, states and alleges as follows:

123.   Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 122 of this Complaint as though fully set forth herein.

124.   Defendants, in performing legal services for plaintiff, had a duty to use that degree of learning, skill and care that a reasonably competent lawyer would use in the same or similar circumstances.

125.   Defendants breached their legal duty to plaintiff and were careless and negligent in their representation of plaintiff in several material respects including but not limited to the following:

a.      Allowing Boulware to handle the Lawsuit, including drafting and filing Dr. Idstrom's initial petition, when he was not licensed to practice law in Kansas and/or knowledgeable about the Kansas Rules of Civil Procedure;

b.      Failing to know, understand and follow the Kansas Rules of Civil Procedure;

c.      Failing to know, understand and follow Kansas law for pleading punitive damages;

d.      Failing to timely file a motion to amend Dr. Idstrom's petition to add a claim for punitive damages;

e.      Failing to include in the record on appeal the Director Defendants' Motion for Summary Judgment and Memorandum in Support to preserve Dr. Idstrom's appeal of the trial court's decision granting the Director Defendants summary judgment on his claim for breach of fiduciary duty/wrongful termination;

f.      Failing to include in the record on appeal the Director Defendants' Motion for Summary Judgment and Memorandum in Support to preserve Dr. Idstrom's appeal of the trial court's decision barring claims, evidence and damages before May 8, 2009;

g.      Failing to know and understand how to establish liability under the KRTA and violations of antitrust laws;

h.      Failing to object to improper jury instructions;

i.       Failing to propose proper jury instructions;

j.       Failing to object to the Director Defendants' counsel's improper and prejudicial closing arguments; and

k.      Failing to appeal the Director Defendants' counsel's improper and prejudicial closing arguments.

126.    Defendants' negligence and legal malpractice directly caused Dr. Idstrom to sustain money damages.

127.    But for the defendants' negligence, carelessness and legal malpractice, Dr. Idstrom would have prevailed in the Lawsuit and would have been awarded approximately Twenty-Five Million Dollars ($25,000,000) in damages which would have been a collectible judgment against the defendants in the Lawsuit.

WHEREFORE, plaintiff prays for Judgment on Count I of his claim against defendants for a sum in excess of Seventy-Five Thousand Dollars ($75,000.00); for reimbursement and/or disgorgement of all fees paid to defendants and the costs incurred at their direction and for prejudgment interest at 10 percent per annum on these liquidated amounts pursuant to K.S.A. § 16-201 *et. seq.*; for the value of the punitive damages he was unable to recover because of defendants' negligent conduct; for his costs and expenses in bringing this action; and for such other relief as he may be entitled to by law or as the Court deems just and proper.

## COUNT II – BREACH OF FIDUCIARY DUTY

Plaintiff, for Count II of his causes of action against defendants, states and alleges as follows:

128.   Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 127 of this Complaint as though fully set forth herein.

129.   In representing and providing legal services and legal advice to plaintiff, defendants had a fiduciary duty to act in good faith and with due regard to plaintiff's interests and were prohibited from placing their interests ahead of plaintiff's interests.

130.   Defendants willfully, wantonly, intentionally and recklessly disregarded plaintiff's interests and breached their fiduciary duties to plaintiff in several material respects including but not limited to placing their own financial interests ahead of plaintiff's interests by diverting their attention away from plaintiff's Lawsuit after converting to a contingent fee agreement with plaintiff which resulted in defendants being unprepared for trial which caused or contributed to cause Dr. Idstrom from prevailing on his claims.

131.   But for the defendants' breach of fiduciary duty to Dr. Idstrom, Dr. Idstrom would have prevailed in the Lawsuit and would have been awarded approximately Twenty-Five Million Dollars ($25,000,000) in damages which would have been a collectible judgment against the defendants in the Lawsuit.

WHEREFORE, plaintiff prays for Judgment on Count II of his claim against defendants for a sum in excess of Seventy-Five Thousand Dollars ($75,000.00); for reimbursement and/or disgorgement of all fees paid to defendants and the costs incurred at their direction and for prejudgment interest at 10 percent per annum on

33

these liquidated amounts pursuant to K.S.A. § 16-201 *et. seq.*; for the value of the punitive damages he was unable to recover because of defendants' negligent conduct; for punitive damages as warranted by the evidence; for his costs and expenses in bringing this action; and for such other relief as he may be entitled to by law or as the Court deems just and proper.

### COUNT III – VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT

Plaintiff, for Count III of his causes of action against defendants, states and alleges as follows:

132. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 131 of this Complaint as though fully set forth herein.

133. Plaintiff is a "consumer" within the meaning of the Kansas Consumer Protection Act, K.S.A. § 50-623, *et seq.* (hereinafter "KCPA").

134. Defendants are "suppliers" within the meaning of the KCPA.

135. The "services" defendants provided to plaintiff are encompassed within the meaning of the KCPA.

136. Defendants held themselves out to plaintiff as having a "formidable track record of success in trials, arbitrations and appeals…and a national reputation for aggressive yet practical approach" to litigation and represented to plaintiff that German May's "attorneys are seasoned trial lawyers" with "concentrated litigation experience."

137. Defendants further represented to plaintiff that they would devote the time and resources necessary to properly, adequately and thoroughly represent plaintiff in the Lawsuit.

34

138.    Defendants further represented to plaintiff that they knew, understood and were experienced in litigating the types of claims they asserted on behalf of plaintiff in the Lawsuit and that they knew, understood and were experienced in appealing adverse decisions to the Kansas Court of Appeals and the Kansas Supreme Court.

139.    Defendants violated the KCPA and engaged in deceptive acts and practices in connection with a consumer transaction which include but are not limited to the following:

a.    Failing to inform plaintiff that they did not know or understand how to properly plead, prove and recover punitive damages in the Lawsuit; and

b.    Misleading plaintiff about their experience, expertise and ability to properly litigate plaintiff's claims and preserve for appeal any rulings adverse to plaintiff.

140.    The aforesaid acts and omissions constitute deceptive acts and practices in violation of the KCPA.

141.    As a direct and proximate result of defendants' violations of the KCPA, plaintiff suffered damages.

WHEREFORE, plaintiff prays for Judgment on Count III of his claim against defendants for a sum to be determined by the Court in accordance with the KCPA; for his costs, expenses and attorneys' fees in bringing this action as provided for in the KCPA; for civil penalties as provided for in the KCPA; and for such other relief as plaintiff may be entitled to by law or as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury in the above-captioned case.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby designates Kansas City, Kansas as the place for trial in the above-captioned case.

HAMILTON LAW FIRM LLC


By:/s/Patrick A. Hamilton
Patrick A. Hamilton, KS Bar No. 16154
13420 Santa Fe Trail Drive
Lenexa, KS 66215
PHONE: (913) 888-7100
FAX: (913) 888-7388
patrick@lenexalaw.com
ATTORNEYS FOR PLAINTIFF